**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOY SINGH, Individually And On Behalf Of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>v.<br><br>TRI-TECH HOLDING, INC.; WANZONG ZHAO a/k/a WARREN ZHAO; YUNXIANG FAN a/k/a PHIL FAN; GUANG CHENG a/k/a GAVIN CHENG; PENGYU DONG a/k/a PETER DONG; ERIC HANSON, PETER ZHOU, JOHN MCAULIFFE, PEIYAO ZHANG, DA-ZHUANG GUO, MING ZHU, DAVID HU, XIAOPING ZHOU, and ROBERT W. KRAFT,<br><br>                Defendants. | No: 13-CV-9031 (KMW)<br><br>**JOINT SUPPLEMENTAL RESPONSE OF THE PARTIES TO ORDER (DKT. NO. 47)** |

**Question 1**:   What is the scope of the investigation that Lead Plaintiffs have conducted regarding the merits of this action?  What types of information have they collected, and how is that information relevant to their claims?

**Plaintiffs' Answer**:   We reviewed Securities and Exchange Commission filings made by Tri-Tech Holding Inc. ("Tri-Tech" or the "Company") as well as materials posted by the Company on its website, together with news reports on the Company and its financial prospects and results published in the United States and in the People's Republic of China ("PRC").  Through our private investigator, we followed up on leads in the PRC and conducted interviews of various potential witnesses.  These investigation efforts provided us sufficient information to assess the strengths and weaknesses of our case.

The information collected was relevant to Plaintiffs' allegations that Defendants made false statements as to their internal controls, as well as Plaintiffs' allegations that Defendants falsely reported that they had actual control over their VIEs.

We also collected information on the trading price history of Tri-Tech stock in connection with the alleged corrective disclosures in order to assess damages.  We conducted an analysis on the Company's stock price movement in reaction to material news as it is relevant to the fraud-on-the-market presumption of reliance—which is necessary for class certification.

Lastly, prior to negotiating the proposed settlement we were provided information about defendants' insurance coverage—which is limited to a single directors' & officers' liability policy of $2 million. This policy is a "wasting" policy, meaning that the insurance proceeds are used to pay defense costs and to fund any potential resolution of this matter.

**Question 2**:   What is the approximate likelihood that Lead Plaintiffs would prevail at trial?

**Plaintiffs' Answer**: We believe this case has merit, but securities class actions are complex and risky matters, especially ones involving a company headquartered in China.

We would face numerous material risks prior to trial. We faced risks relating to pleading a case sufficient to meet the heightened pleading standards of the PSLRA, particularly with respect to pleading scienter. For example, while Plaintiffs allege accounting standards violations (*i.e.,* GAAP), it is well settled that GAAP violations, standing alone, are not sufficient to allege scienter. Pleading scienter with specificity is always a difficult task.

Had Plaintiffs successfully opposed defendants' motion to dismiss, we faced an expensive "battle of the experts" on loss causation and damages; nor could we predict which competing damage model or loss causation theory would be accepted by the fact finder. Such a costly and protracted "battle of the experts" would have occurred at the class certification stage as well, as defendants would have contested the fraud-on-the-market presumption of reliance.

Assuming that we defeated defendants' summary judgment motions and the case proceeded to trial, there is no doubt a trial in this action would be both lengthy and costly. Further, a favorable judgment for Plaintiffs could be the subject of post-trial motions and appeals, delaying any payment to class members even if Plaintiffs were to prevail at trial.

Given the small wasting insurance coverage here, the insurance proceeds would have been expended long before trial. Therefore, obtaining a favorable verdict in this case would likely be a Pyrrhic victory.

**Defendant's Answer**: Even if part of the Second Amended Complaint survived a motion to dismiss under the PSLRA and Rule 12, Fed. R. Civ. P., Tri-Tech does not believe that Lead Plaintiffs would prevail on the merits through summary judgment, class certification, and trial.

**Question 3**:   What is the estimated cost of litigating this action through trial and any anticipated appeal?

**Plaintiffs' Answer**:  The cost of litigating this case through trial would be several hundreds of thousands of dollars for Plaintiffs. A large portion of the costs would be for experts. We would need an expert for class certification to conduct an event study and run other tests to invoke the fraud-on-the-market presumption of reliance. Costs related to such a report and deposition testimony typically range between $150,000 to $250,000 depending on the length of the Class Period—here there is almost a four year Class Period. We would likely incur an additional $100,000 for trial preparation and trial testimony. Accounting experts would be necessary relating to the accounting rules involved in this case. This could cost between $100,000 to

$150,000 for an expert report; perhaps an additional $35,000 to $50,000 for trial preparation and trial testimony.

Costs relating to document translation from Chinese to English would be substantial given the Company is headquartered in, and operates in, the PRC.   These rates are typically 8 to 10 cents a word.

Depositions of the PRC-based defendants would be conducted in Hong Kong, as depositions are not permitted in the PRC.   Based on our prior experience, the cost of a Hong Kong deposition is approximately $4,000 to $5,000 per day.   If there are ten depositions, the cost would be $40,000 to $50,000.   This does not include travel, lodging or meals—which in Hong Kong would be conservatively $400-$500 a day.

Other material costs would include document hosting and e-discovery costs and expenses related to document retrieval in the PRC.

For example, in *Nguyen v. Radient Pharmaceuticals Corp.*, 2014 WL 1802293 (C.D. Cal. May 6, 2014), The Rosen Law Firm ("Rosen") was sole lead counsel in a case involving a small American company, one alleged false disclosure, and a three month class period.   The expenses in that case, which included obtaining class certification and successfully opposing summary judgment were $421,689.87.   *Id.*, at * 11.   *Radient* only involved two experts on the Plaintiffs side and no competing experts by defendants.   In another case, involving a financial restatement with an American company, the Rosen Firm retained damages and accounting experts and the expenses in that case were over $600,000 before that case was resolved during discovery.

In short, the cost of merely completing discovery and getting this case trial ready will be significant.

**Question 4**:    By what method did Lead Plaintiffs calculate total class damages as $5.2 million? (*See* June 8, 2015 Ltr. at 1 [ECF No. 46]).

**Plaintiffs Answer**:    We multiplied the stock price drop after the trading halt ($0.94/share)[1] by the float (5.5 million)—this is the number of shares that were not held by insiders and available for trading. This is an aggressive measure of damages because it does not offset potential profits during the class period, assumes that every share in the float was damaged, and does not control for stock price movements on the corrective disclosure date(s) in excess of regular market returns

---

[1] In this case, shares held through the corrective disclosure is the key metric given that the corrective disclosure occurred at the end of the class period and during the trading halt—as those are the shares that were damaged. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) ("But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."). Trading in Tri-Tech's stock was halted in the afternoon of December 12, 2013 and the halt continued through April 16, 2014.  On that date, Tri-Tech's stock closed down $0.94/share.

and information unrelated to the fraud that might have caused and/or contributed to the stock price decline.[2]

**Question 5**:   Lead Plaintiffs estimate that the proposed settlement represents 18.8% of total class damages.  *Id.*  How does that figure compare to the percentages of total damages recovered in settlements of similar securities class actions over the last ten years?  Cf. Manual for Complex Litigation (4th) § 22.924 (emphasizing the importance of evaluating "the historic values of cases involving the same or similar claims and defenses").

**Plaintiffs' Answer**:   The settlement amount of $975,000 represents 18.8% of maximum class wide damages of $5.1 million, which is a good recovery.   *See In re Rite Aid Corp. Sec. Litig.*, 146 F.Supp.2d 706, 715 (E.D. Pa. 2001) (between 1995 and 2001 class action settlements recovered between 5.5% and 6.2%).

A recent study shows that between 2005 through 2014 the median value of settlements as to estimated damages, ranged between a low of 1.8% in 2012 and high of 3.1% in 2005.  In 2014, the median was 2.2%.  *See* Securities Class Action Settlements, 2014 Review and Analysis, Cornerstone Research ("Cornerstone Report"), attached hereto as Exhibit 1, at 8.  For cases that have estimated damages less than $50 million, the median settlement to estimated damages in 2014 was 9.9%.  *Id.*, at 9.  Between 2005-2013 the median settlement for cases with estimated damages less than $50 million was 11.7%.  *Id.*

**Item 6**:        Lead Plaintiffs claim that "Tri-Tech has very few assets to cover more than the share of the Settlement Amount that it is paying." (Pl. Mem. in Supp. of Proposed Settlement at 14 [ECF No. 45]).

     a.      **Question**:        What proportion of the proposed settlement amount would Tri-Tech pay?  What proportions of the settlement amount would the other defendants pay?  How were those proportions determined?

     b.      What is each defendant's ability to pay a judgment in this action?  In particular, what assets does Tri-Tech possess that could "cover more than the share of the Settlement Amount that it is paying."

**Plaintiffs' Answer**: Tri-Tech is a microcap penny stock.  Immediately after the trading halt, Tri-Tech's market capitalization was less than $5 million.  As of June 22, 2015, Tri-Tech's market

---

[2] In a typical expert damages analysis, an expert will need to determine what portion of the stock price decline was attributable to the fraud and not the typical stock price movement of the stock. An expert will compare the stock price movement on a particular date to an index or a basket of similar stocks to determine whether there were excess returns that were statistically significant. At later stages in the case, issues as to whether confounding information may have caused the stock price decline will be addressed.  All of this has the practical impact of lowering the estimate of damages as the case moves forward.

capitalization is only $1.86 million and its stock is trading at $0.22/share.  It is unclear what, if any, assets Tri-Tech would have available in the future, and its assets are largely in China.

All but three defendants are believed to be in China, and enforcing a U.S. judgment in the PRC is not possible.  The three non-China based defendants are outside directors and are only being sued herein as control persons under Section 20(a).  As outside directors, they would have a colorable good faith defense.  If they were found liable, they would only be proportionately liable.

**Defendant's Answer**:

Tri-Tech would pay $610,000 of the $975,000 proposed settlement.  The other defendants, all individuals, are current or former directors or officers of Tri-Tech. Most of the individual defendants have not been served and have not appeared in the action, and some may contest personal jurisdiction.  Moreover, the individual defendants have claimed, or presumably would claim, indemnification from Tri-Tech.

Tri-Tech's D&O insurance carrier participated in the mediation described in the papers filed in support of the motion for preliminary approval of the proposed settlement.  With the assistance of the mediator, Tri-Tech was able to negotiate with the D&O insurance carrier that the carrier would agree to fund a portion of the proposed settlement.  Accordingly, Tri-Tech's D&O insurance carrier would pay the remaining $365,000 of the proposed settlement.

Tri-Tech has insufficient assets available to pay a substantially larger judgment.  On March 20, 2015, Tri-Tech filed a Form 6-K disclosing that on March 14, 2015, Mr. Phil Fan tendered his resignation as a director and Chief Executive Officer, and Mr. Fan stated that "his resignation was based on his doubt that the Registrant would be able to continue as a going concern," and that he "did not believe the Registrant would be able to raise sufficient funds to repay its immediate obligations in a timely manner."  Tri-Tech stated in that Form 6-K that it is "in the midst of preparing its annual report and is in the process of analyzing and discussing with its auditor the going concern issue.  Accordingly, the Registrant has not yet reached a conclusion regarding the matter and believes the most prudent course of action is to review the matter fully in connection with its annual report and disclose fully in its audited financial statements." Tri-Tech has not yet filed its annual report for the period ending December 31, 2014.

**Item 7**:        Under the Private Securities Litigation Reform Act, "in any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S.C. § 78u-4(e)(1).

      a.    **Question**: According to the proposed Notice of Pendency and Proposed Settlement of Class Action (the "Notice"), the 90-day period described in 15

U.S.C. § 78u-4(e)(1) began on April 16, 2014. (Notice at 8 n.1 [ECF No. 43 Ex. 1]). According to the SAC, however, the date of initial dissemination was December 12, 2013. (Am. Complaint ¶¶ 13–14 [ECF No. 34]). Should the 90-day period described in 15 U.S.C. § 78u-4(e)(1) begin on that date instead?

b.   If the 90-day period described in 15 U.S.C.A. § 78u-4(e)(1) in fact starts on December 12, 2013, what is the new mean trading price for the period? How was that figure calculated, and how does it alter Lead Plaintiffs' estimate of total class damages?

**Plaintiffs' Answer**:   As noted in footnote 1 of the proposed Plan of Allocation (the "POA") (Dkt. No. 43-2), after the corrective disclosure on December 12, 2013, the Company's stock was halted from trading from the afternoon of December 12, 2013 to April 15, 2014. During this time period there was no activity (no trading and no pricing) in the stock. If we applied a 90 day price beginning on December 13, 2013, the average price would be $0 per share or $1.44 per share.[3] $0 per share would have been an understated stock value and overstated recognized losses. $1.44 per share would have overstated stock value and understated recognized losses. Tri-Tech stock was valued at $.50 per share at the close of trading once trading commenced again on April 16, 2014. This was disclosed in footnote 1 in the proposed POA. This is also consistent with industry norms in addressing the 90 day period in the POA when there is an interim halt of trading.

**Item 8**:      The proposed plan of allocation limits the recognized loss per share to a maximum of (1) $1.11 for shares purchased between October 10, 2009 and December 11, 2013 and retained after December 12, 2013; (2) $0.17 for shares purchased between October 10, 2009 and December 11, 2013 and sold on December 12, 2013; and (3) $0.94 for shares purchased on December 12, 2013 and retained after December 12, 2013. (Notice at 7–8).

a.   **Question**:      Why does the proposed plan of allocation divide shares into those three categories?

**Plaintiffs' Answer**:

**Category 1 ($1.11 per share)** - The $1.11 per share ($1.61 per share minus $.44 per share) represents the drop in stock price over a two-trading day period from the close of business on December 11, 2013 ($1.61 per share) and the close of business once the stock commenced trading on April 16, 2014 ($.50 per share).    These Class Members ("CMs") are those that purchased during the Class Period on or before December 11, 2013 and held through the two corrective disclosures as noted below and detailed in the SAC. The first corrective disclosure was on December 12, 2013, the day the Company filed its Form 8-K regarding the Company's

---

[3] $0.00 per share assumes an illiquid price based on the trading halt and $1.44 per share would represent the last quoted price before the trading halt.

failure to disclose material events (*see* ¶ 91 of the SAC). The second corrective disclosure was the halt of trading by NASDAQ during the trading day on December 12, 2014 and the corrective information disclosed during the trading halt.

**Category 2 ($0.17 per share)** - This category represents CMs who held through the first corrective disclosure only, namely a CM who purchased prior to December 11, 2013 but sold on December 12, 2013. The $.17 per share is the difference between the closing price of the Company's stock on December 11, 2013 at $1.61 per share and the closing stock price on December 12, 2013 of $1.44 per share.

**Category 3 ($0.94 per share)** - This category represents CMs who purchased on December 12, 2013 and held through the second corrective disclosure only. The $.94 per share is difference between the closing price of the Company's stock on December 12, 2013 at $1.44 per share and the closing stock price on the commencement of trading on April 16, 2014 of $.50 per share.

Plaintiffs' counsel has consulted with a Claims Administrator (Strategic Claims Services) to develop these categories which we believe are consistent with industry norms in preparing a proposed POA. The POA is consistent with loss causation principles as crediting those losses only attributable to revelation or materialization of the allegedly true facts. *See In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 509-12 (2d Cir. 2009); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).

> b. **Question**: How were the distinct limits on recognized loss per share in each category calculated?

**Plaintiffs' Answer**: The distinct limits represent the declines in stock price for each of the two corrective disclosures. As noted above, the first and second corrective disclosures had price drops of $.17 per share and $.94 per share, respectively. CMs who held through both collective disclosures had a distinct loss limit of $1.11 per share. This is consistent with industry norms and with loss causation principles as crediting those losses only attributable to revelation or materialization of the allegedly true facts.

> c. **Question:** It appears that no Lead Plaintiff owned shares in the second category described above — those purchased between October 10, 2009 and December 11, 2013 and sold on December 12, 2013. (*See* Baker Group's List of Transactions [ECF No. 11 Ex. B]; Tri-Tech Group's List of Transactions [ECF No. 13 Ex. 3]). In light of that fact, how do Lead Plaintiffs meet the typicality and adequacy requirements of Federal Rule of Civil Procedure 23(a)?

**Plaintiffs' Answer**:

**Typicality:** Rule 23(a)(3) mandates that the claims of a representative plaintiffs be typical of the claims of the class. The focus of the inquiry is on the defendants' actions, not on plaintiffs' behavior. A plaintiff's claim is typical if it arises from "the same course of events and each class member makes similar legal arguments to prove defendants' liability." *In re Flag Telecom Holdings, Ltd. Sec. Ltd.*, 574 F.3d 29, 35 (2d Cir. 2009). In other words:

Because this inquiry focuses on the nature of the claims asserted, factual differences involving the date, type and manner of the purchase, the investor's perception of the transaction, or even the information furnished to him at the time will not destroy typicality if each class member was the victim of the same material omissions and the same consistent course of conduct.

*In re Baldwin-United Corp. Litig.*, 122 F.R.D. 424, 428 (S.D.N.Y. 1986)

Here, Lead Plaintiffs assert a continuous course of conduct that was disclosed through two corrective disclosures.  Lead Plaintiffs' claims as well as all CM's claims in three categories above all arise from the same uniform conduct alleged in this case.  Lead Plaintiffs and CMs will rely on similar legal and factual arguments.  Thus, Lead Plaintiffs here are typical of all CMs. *See In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 87 (S.D.N.Y. 2007) (lead plaintiffs have standing if they bought anytime before the end of the class period, provided there is a common course of conduct throughout the class period) (collecting cases).

**Adequacy**:  Adequacy of representation is measured by two standards, whether: "1) plaintiff's interest are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experiences and able to conduct the litigation."  *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).  Here, there is no conflict because the Lead Plaintiffs have agreed to a settlement that treats all CMs equally in the three categories above. CMs will receive a *pro rata* share of the recovery through the POA depending on the number of shares they purchased and sold.

**Question 9**:   Should the date "October 10, 2009" be changed to "September 10, 2009" on pages 7–9 of the Notice?

**Plaintiffs' Answer**:   Yes, this was a typographical error.

**Question 10**:  Should the date "July 24, 2014" be changed to "July 14, 2014" on page 8 of the Notice?

**Plaintiffs' Answer**:   Yes, this was a typographical error.

**Item 11:**       Please provide time sheets for all work Lead Counsel has performed in connection with this action.

**Plaintiffs Answer:**     To be provided *in camera* to the Court under separate cover.

**Item 12:**       Rule 23(e)(3) – identification of "any agreement made in connection with the proposal" by June 26, 2015.

**Joint Answer:**

The only agreements between Plaintiffs and Defendants are: (1) The verbal agreement to settle made with the assistance of the mediator from JAMS; (2) the written Stipulation of Settlement,

filed with the Court as Dkt. No. 43; and (3) the Confidential Supplemental Agreement referred to in the Stipulation of Settlement.  As paragraph 10.5 of the Stipulation of Settlement discloses, that Confidential Settlement Agreement is an "Opt-out Threshold" agreement which specifies that if the threshold number of shares request exclusion from the Settlement Class, Tri-Tech would have a Supplemental Termination Option.  Should the Court want to examine the "Opt-out-Threshold" agreement, the parties are willing to provide the document for *in camera* inspection.

Dated:      June 26, 2015
            New York, New York

                              **THE ROSEN LAW FIRM, P.A.**


                              By: /s/ Phillip Kim
                                  Laurence M. Rosen
                              Phillip Kim
                              275 Madison Avenue, 34th Floor
                              New York, New York 10016
                              Tel: (212) 686-1060
                              Fax: (212) 202-3827

                              **GAINEY McKENNA & EGLESTON**

                              By: /s/ Thomas J. McKenna (signed with consent)
                                   Thomas J. McKenna
                              Gregory M. Egleston
                              440 Park Avenue South, 5th Floor
                              New York, New York 10016
                              Tel: (212) 983-1300
                              Fax: (212) 983 -0383

                              ***Lead Counsel for Plaintiffs***

                              **GREENBERG TRAURIG, LLP**


                              By: /s/ Stephen Saxl (signed with consent)
                                  Stephen L. Saxl
                              200 Park Avenue, 39th Floor
                              New York, New York 10166
                              Tel: (212) 801-2184
                              Fax: (212) 801-6400

                              ***Counsel for Defendant Tri-Tech Holding Inc.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this, the 26th day of June 2015, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Phillip Kim_____